J-S06001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1303 WDA 2024 |

Appeal from the Order Entered October 9, 2024
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000049-2024

| IN THE INTEREST OF: D.R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1324 WDA 2024 |

Appeal from the Order Entered October 9, 2024
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000050-2024

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:            **FILED: FEBRUARY 26, 2025**

T.W. ("Mother") appeals from the orders entered in the Allegheny County Court of Common Pleas ("orphans' court") terminating Mother's parental rights to her minor children, N.B. and D.R.D. (collectively "the

Children").[1] After our thorough review, we affirm on the basis of the orphans'

court's well-reasoned opinion.

We take the following factual background and procedural history from

the orphans' court's November 22, 2024, opinion.

> Mother's older Child, N.B., was born [in] October [] 2020, and her younger Child, D.R.D., was born [in] January [] 2023. ***See*** N.T. Termination Hearing, 10/7/24, at 48. Alleged father of N.B. was an individual that is deceased. Alleged father of D.R.D. was unknown. ***See id.*** at 49. CYF filed Petitions to Involuntarily Terminate the Parental Rights of Mother and the Unknown Fathers on June [11], 2024. ***See id.***
>
> The family first came to the attention of Allegheny County CYF in 2021. CYF received a referral for general protective services that closed out on January 27, 2023. Four days later, on January 31, 2023, CYF received another referral that Mother [recently] had given birth to her youngest Child, D.R.D., and there were concerns for substance abuse. ***See id.*** at 50. Mother and her newborn Child tested positive for cocaine, marijuana, fentanyl, and methadone (prescribed). ***See id.*** at 50; CYF Exhibit 2—Combined Court Orders, at Order of Adjudication and Disposition, 3/1/23, at 2.
>
> CYF obtained an emergency custody order for both [C]hildren on February 1 and February 2, 2023, respectively, because of the substance abuse concerns. ***See*** N.T. Termination Hearing, 10/7/24, at 50. Upon removal, the older child was placed into a non-relative foster home. Mother's newborn child was placed into the home of an alleged paternal grandmother. After a shelter hearing, where it was ordered that both Children remain in care, the court scheduled a dependency adjudication hearing. At the Shelter Hearing, the court's findings reflect that "Mother acknowledges being on methadone and reported that due to her being pregnant she was micro-dosing as she was getting ill. Mother admitted to heroin use throughout the pregnancy while being the sole caregiver for [Child]. Mother reported using in the

---

[1] The order also terminated the parental rights of D.R.B.'s putative father and N.B.'s now deceased father. The termination of the fathers' parental rights has not been challenged.

bathroom with [Child] present in the living room. Mother per admittance attended one prenatal appointment." CYF Exhibit 2—Combined Court Orders, at Shelter Care Order, 2/3/23, at 1.

The Children were adjudicated dependent on March 1, 2023. *See* N.T. Hearing, 10/7/24, at 51. Mother was directed to complete a drug and alcohol evaluation through [Pennsylvania Organization for Women in Early Recovery ("POWER")] and comply with recommendations, complete random urine screens, attend supervised visits with the Children, attend the Children's medical appointments, and address any of her own mental health needs. *See id.* at 53-54; CYF Exhibit 2—Combined Court Orders, at Shelter Care Order, 2/3/23, at 3; *see id.* at Order of Adjudication and Disposition-Amended, 3/1/23, at 2-3. Mother did not attend the adjudication hearing, despite receiving notice, but was represented by counsel. The court appointed the foster parents as secondary educational and medical decision makers on that same date.

The first permanency review hearing was on June 20, 2023 and the court found that Mother had made minimal progress towards alleviating the circumstances which necessitated removal. *See* CYF Exhibit 2—Combined Court Orders, at Permanency Review Order, 6/20/23, at 1-2. The court made a number of findings of fact with respect to Mother, which reflected her going in and out of treatment, not availing herself of drug and alcohol evaluations, not appearing for random urine screens, not having stable housing, her phone number changing multiple times, the agency's effort to reach her by email, and that Mother had attended four out of thirteen possible supervised visits during this time period. *See id.* at 3. The younger Child had been moved to the foster home of the older Child, and the court ordered that both [C]hildren remain in placement. Mother was to either immediately start treatment and participate in random urine screens, or she needed to complete a drug and alcohol evaluation and follow recommendations. *See id.* at 3. The court also ordered Mother to continue to participate in random screens at the Allegheny County Health Department, continue contact with CYF, receive transportation assistance and in-home services, and attend supervise[d] visits with her Children. *See id.*

The permanency review hearing, scheduled for September 12, 2023, was continued to November 7, 2023, due to the CYF caseworker and caseworker supervisor's unavailability. At the

second permanency review hearing, Mother did not attend in person, and the court again found that Mother made minimal progress towards alleviating the circumstance which necessitated the removal. The Children remained together in foster care, and were receiving appropriate developmental therapies. The court found that Mother had only attended eleven out of twenty-three possible visits during this review period and had failed to provide confirmation for visits, such that there were occasions when the Children were transported to her home and Mother was not present. The court also found that Mother was not appearing for her random urine screens and had agreed to complete a drug and alcohol evaluation at POWER evaluation but they had not been able to make contact with Mother. *See id.* at Permanency Review Order, 11/7/23, at 1-3.

The third permanency review hearing occurred on February 20, 2024. At this hearing, the court found that maternal grandmother, who had visited twice and maintained Facetime contact with the Children, moved back to Pennsylvania from Florida to be assessed for placement. The order reflects that Mother made minimal progress towards alleviating the circumstances which necessitated placement. *See id.* at Permanency Review Order, 2/23/24, 1. Specifically, the court found that Mother had attended zero out of eleven random urine screens this review period. Mother was reported as being back at Gateway inpatient drug and alcohol treatment center and due for discharge later that month, where she was to engage in a step-down in an intensive outpatient treatment at Jade Wellness. The court noted in the order that Mother had pending criminal matters, did not have her own housing, and prior to going inpatient, had only supervised visits with her Children. *See id.* at 3-4.

The court held a de novo review hearing on March 6, 2024 as to the issue of placing the [C]hildren into the care of their maternal grandmother. *See id.* at Permanency Review Order, 3/6/24, at 2. The court indicated that maternal grandmother was to receive two overnight visits each week with the Children, could visit with the Children when Mother was visiting, and could serve as a caregiver to the foster parents during any time they needed, as agreed to between the parties. *See id.* at 2-3.

Through counsel, Mother motioned the court for unsupervised visits with the Children, and the court gave

- 4 -

permission to move to up to four hours of unsupervised time with the Children on April 4, 2024.

However, by the fourth permanency review hearing on April 24, 2024, the court again found that Mother made minimal progress towards alleviating the circumstances which necessitated the placement of the Children. *See id.* at Permanency Review Order, 4/24/24, at 1. Mother had attended five random urine screens at the Allegheny County Health Department, was attending some treatment, and residing with her boyfriend in his mother's home. *See id.* at 2. The court gave permission for the [C]hildren to be placed with their maternal grandmother once all child care and developmental services for the Children were in place at the grandmother's residence. *See id.* at 3. Placement with the maternal grandmother was ratified by the court on June 7, 2024.

Allegheny County CYF filed petitions to terminate the parental rights of Mother and the unnamed fathers on June 11, 2024. *See* N.T. Hearing, 10/7/24, at 59.

The fifth permanency review occurred on June 26, 2024, and at this hearing, the maternal grandmother was appointed as secondary education and medical decision maker for the Children. Mother did not attend this permanency review hearing and the court found that Mother had made minimal progress towards alleviating the circumstances which necessitated the original placement. *See* CYF Exhibit 2—Combined Court Orders, at Permanency Review Order, 6/26/24, at 1. The court also found that Mother reported being involved in substance abuse treatment but that CYF was unable to obtain updates. Additionally, the order reflected concerns about Mother's sobriety, noting: "On May 6, 2024, the [Allegheny County Health Department ("ACHD"] reported that [M]other was found to have a device strapped to her leg with urine. She indicated to the caseworker that she relapsed on marijuana." *Id.* at 2. Mother stopped working with in-home services, had been unwilling to address her housing needs, and her engagement with CYF had decreased this reporting period. Mother's visitation returned to supervised, and the [c]ourt scheduled a goal change and contested termination hearing for October 7, 2024. *See id.* at 2-3.

At the time of the contested termination proceeding on October 7, 2024, the Children had been in care for twenty months

and were residing in relative foster care with their maternal grandmother. Mother's visitation remained supervised.

Orphans' Court Opinion, 11/22/24, at 2-8 (some record citation formatting and some record citations provided, footnotes, some record citations, and some quotation marks omitted).

On October 9, 2024, the orphans' court entered an order terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b). Mother timely appealed and filed a contemporaneous statement of errors. *See* Pa.R.A.P. 1925(a)(2)(i).

Mother raises three issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b)?

3. Did Mother waive her right to challenge the trial court's decision to terminate her parental rights under 23 Pa.C.S. §2511(a)(2), (5), (8), and (b)?

Appellant's Brief, at 6 (suggested answers omitted).

Based upon our independent review of the record and the briefs of the parties, we affirm on the basis of the thorough and well-reasoned November 22, 2024, opinion of the Honorable Judge Jennifer S. McCrady. Judge McCrady provided a detailed history of this case and the applicable law, before then finding CYF presented clear and convincing evidence to support the

termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). We rely on the court's findings as to section 2511(a)(2), (b). The Orphans' Court Opinion, at pages 12-21 and 26-30, found that CYF established Mother's "repeated and continued incapacity, abuse, neglect, or refusal" "caused these Children to be without essential parental care control, or subsistence necessary for their physical or mental well-being, and the conditions and causes of Mother's incapacity, abuse neglect, or refusal would not be remedied" because Mother failed to comply with her permanency plan where:

1. Mother failed to remain in regular contact with CYF;

2. Mother only appeared at 7 of 56 random drug screens despite CYF providing bus passes and gas assistance;

3. CYF was unable to verify any successful drug treatment by Mother despite her random participation in some inpatient treatment;

4. Mother's failure to provide CYF with any documentation or releases related to her mental health treatment;

5. Mother's lack of consistent work or any stable housing;

6. Mother's inconsistent visitation with the Children, which primarily remained supervised;

7. Mother's repeated criminal charges;

8. Mother's failure to provide "any credible evidence or testimony to contradict the evidence and testimony in support of [the] court's conclusion;" and

9. despite Mother having some emotional bond with the Children, credible evidence and testimony that "any potential detriment to the Children from terminating Mother's rights would be mitigated by the loving and secure relationship the Children and maternal grandmother have established" and that "termination would best meet the developmental, physical and emotional needs of the Children" pursuant to 23 Pa.C.S.A. § 9511(b)).

*See* Orphans' Court Opinion, 11/22/24, at 12-21, 26-30.

Accordingly, we affirm the orphans' court's order involuntarily terminating Mother's parental rights on the basis of the orphans' court's comprehensive opinion.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/26/2025

Circulated 02/18/2025 01:26 PM

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA
ORPHANS COURT DIVISION

| | |
|---|---|
| IN THE INTEREST OF: <br> N.B. and D.R.D., minor children. <br><br> APPEAL OF: <br> T.W., Mother. | : **CHILDREN'S FAST** <br> **TRACK** <br> : **APPEAL** <br> : <br> : <br> : <br> :   No. CP-02-AP-49-2024 <br> :   No. CP-02-AP-50-2024 <br> : <br> :   1303 WDA 2024 |

**E-FILED**

NOV 2 2 2024

CIVIL/FAMILY DIVISION
DEPT. OF COURT RECORDS
ALLEGHENY COUNTY, PA

**OPINION**

Judge McCrady                               November 19, 2024

Following a one-day hearing on October 7, 2024, where Mother participated remotely by telephone[1] and was represented by counsel, this court issued an order granting the Petition of the Allegheny County Children, Youth and Families ("CYF") for the involuntarily termination the parental rights of Appellant T.W. ("Mother") to the minor children, N.B. and D.R.D. ("Child" or "Children"), pursuant to 23 Pa.C.S. §2511 (a)(2), (a)(5), (a)(8), and (b). The Children were

---

[1] Prior to going on the record, Mother's counsel requested that her client be permitted to participate in the proceeding via telephone and this court granted that request. Mother was on speakerphone throughout the duration of the termination proceeding.

represented by court appointed legal counsel.[2] Mother timely appeals this order, and for the reasons set forth below, the order involuntarily terminating her parental rights should be affirmed.[3]

## Relevant Factual and Procedural History

Mother's older Child, N.B., was born on October █, 2020, and her younger Child, D.R.D., was born on January █, 2023. T.T. at 49.[4] Alleged father of N.B. was an individual that is deceased. Alleged father of D.R.D. was unknown. *Id.* CYF filed Petitions to Involuntarily Terminate the Parental Rights of Mother and the Unknown Fathers on June 22, 2024. *Id.*

The family first came to the attention of Allegheny County CYF in 2021. *Id.* CYF received a referral for general protective services that closed out on January 27, 2023. *Id.* ~~Four days later~~, on January █, 2023, CYF received another referral that Mother had given birth to her youngest Child, D.R.D., and there were concerns for substance abuse. *Id.* at 50. Mother and her newborn Child tested

---

[2] This court conducted an a conflict analysis and entered an order appointing legal counsel for the termination proceeding prior to the contested date.

[3] CYF filed petitions to involuntarily terminate the rights of Mother and unknown fathers. Upon the conclusion of testimony on October 7, 2024, this court terminated the parental rights of Mother based upon the subsections addressed herein and terminated the parental rights of unknown fathers pursuant to 23 Pa.C.S. §2511 (a)(1), (a)(2), (a)(5), (a)(8), and (b). No individual has come forward to claim paternity to either child. Transcript of Testimony ("T.T.") at 70.

[4] Transcript of Testimony for the one day evidentiary hearing that occurred in this matter on October 7, 2024 hereinafter "T.T.".

positive for "cocaine, marijuana, fentanyl, and methadone (prescribed)." CYF Exhibit 2- Combined Court Orders.

CYF obtained an emergency custody order for both children on February 1 and February 2, 2023, respectively, because of the substance abuse concerns. T.T. at 50; see also CYF Exhibit 2 - Combined Court Orders. Upon removal, the older child was placed into a non-relative foster home. *Id.* at 50. Mother's newborn child was placed into the home of an alleged paternal grandmother. *Id.* After a shelter hearing, where it was ordered that both Children remain in care, the court scheduled a dependency adjudication hearing. CYF Exhibit 2 - Combined Court Orders. At the Shelter Hearing, the court's findings reflect that "Mother acknowledges being on methadone and reported that due to her being pregnant she was micro-dosing as she was getting ill. Mother admitted to heroin use throughout the pregnancy while being the sole caregiver for [Child]. Mother reported using in the bathroom room with [Child] present in the living room. Mother per admittance attended one prenatal appointment." *Id.*

The Children were adjudicated dependent on March 1, 2023. *Id.* at 51. Mother was directed to complete a drug and alcohol evaluation through POWER[5] and comply with recommendations, complete random urine screens, attend

___

[5] POWER stands for Pennsylvania Organization for Women in Early Recovery. This local organization provides gender inclusive drug and alcohol assessments, recommendations and referrals for treatment, peer mentorship and support along the continuum of care.

3

supervised visits with the Children, attend the Children's medical appointments, and address any of her own mental health needs. *Id.* at 51; see also CYF Exhibit 2 - Combined Court Orders. Mother did not attend the adjudication hearing, despite receiving notice, but was represented by counsel. CYF Exhibit 2 - Combined Court Orders. The court appointed the foster parents as secondary educational and medical decision makers on that same date. *Id.*

The first permanency review hearing was on June 20, 2023 and the court found that Mother had made minimal progress towards alleviating the circumstances which necessitated removal. *Id.* The court made a number of findings of fact with respect to Mother, which reflected her going in and out of treatment, not availing herself of drug and alcohol evaluations, not appearing for random urine screens, not having stable housing, her phone number changing multiple times, the agency's effort to reach her by email, and that Mother had attended four out of thirteen possible supervised visits during this time period. *Id.* The younger Child had been moved to the foster home of the older Child, and the court ordered that both children remain in placement. *Id.* Mother was to either immediately start treatment and participate in random urine screens, or she needed to complete a drug and alcohol evaluation and follow recommendations. *Id.* The court also ordered Mother to continue to participate in random screens at the Allegheny County Health Department, continue contact with CYF, receive

4

transportation assistance and in-home services, and attend supervise visits with her Children. *Id.*

The permanency review hearing, scheduled for September 12, 2023, was continued to November 7, 2023, due to the CYF caseworker and caseworker supervisor's unavailability. *Id.* At the second permanency review hearing, Mother did not attend in person, and the court again found that Mother made minimal progress towards alleviating the circumstance which necessitated the removal. *Id.* The Children remained together in foster care, and were receiving appropriate developmental therapies. *Id.* The court found that Mother had only attended eleven out of twenty-three possible visits during this review period and had failed to provide confirmation for visits, such that there were occasions when the Children were transported to her home and Mother was not present. *Id.* The court also found that Mother was not appearing for her random urine screens and had agreed to complete a drug and alcohol evaluation at POWER evaluation but they had not been able to make contact with Mother. *Id.*

The third permanency review hearing occurred on February 20, 2024. At this hearing, the court found that maternal grandmother, who had visited twice and maintained Facetime contact with the Children, moved back to Pennsylvania from Florida to be assessed for placement. *Id.* The order reflects that Mother made minimal progress towards alleviating the circumstances which necessitated

5

placement. *Id.* Specifically, the court found that Mother had attended zero out of eleven random urine screens this review period. *Id.* Mother was reported as being back at Gateway inpatient drug and alcohol treatment center and due for discharge later that month, where she was to engage in a step-down in an intensive outpatient treatment at Jade Wellness. *Id.* The court noted in the order that Mother had pending criminal matters, did not have her own housing, and prior to going inpatient, had only supervised visits with her Children. *Id.*

The court held a de novo review hearing on March 6, 2024 as to the issue of placing the children into the care of their maternal grandmother. *Id.* The court indicated that maternal grandmother was to receive two overnight visits each week with the Children, could visit with the Children when Mother was visiting, and could serve as a caregiver to the foster parents during any time they needed, as agreed to between the parties. *Id.*

Through counsel, Mother motioned the court for unsupervised visits with the Children, and the court gave permission to move to up to four hours of unsupervised time with the Children on April 4, 2024. *Id.*

However, by the fourth permanency review hearing on April 24, 2024, the court again found that Mother made minimal progress towards alleviating the circumstances which necessitated the placement of the Children. *Id.* Mother had attended five random urine screens at the Allegheny County Health Department,

6

was attending some treatment, and residing with her boyfriend in his mother's home. *Id.* The court gave permission for the children to be placed with their maternal grandmother once all child care and developmental services for the Children were in place at the grandmother's residence. *Id.* Placement with the maternal grandmother was ratified by the court on June 7, 2024. *Id.*

Allegheny County CYF filed petitions to terminate the parental rights of Mother and the unnamed fathers on June 11, 2024. T.T. at 59

The fifth permanency review occurred on June 26, 2024, and at this hearing, the maternal grandmother was appointed as secondary education and medical decision maker for the Children. CYF Exhibit 2 - Combined Court Orders. Mother did not attend this permanency review hearing and the court found that Mother had made minimal progress towards alleviating the circumstances which necessitated the original placement. *Id.* The court also found that Mother reported being involved in substance abuse treatment but that CYF was unable to obtain updates. *Id.* Additionally, the order reflected concerns about Mother's sobriety, noting: "On May 6, 2024, the ACHD reported that mother was found to have a device strapped to her leg with urine. She indicated to the caseworker that she relapsed on marijuana." *Id.* Mother stopped working with in-home services, had been unwilling to address her housing needs, and her engagement with CYF had decreased this reporting period. *Id.* Mother's visitation returned to supervised, and

7

the Court scheduled a goal change and contested termination hearing for October 7, 2024. *Id.*

At the time of the contested termination proceeding on October 7, 2024, the Children had been in care for twenty months and were residing in relative foster care with their maternal grandmother. Mother's visitation remained supervised.

## Standards

The standards for review in termination cases are well established. Our appellate courts will accept the finding of facts and credibility determinations of the trial court if they are supported by the record, even if the record could also support a different result. *Adoption of C.J.P.*, 114 A.3d 1046, 1049 (Pa. Super. 2015); see also *In re R.J.S.*, 901 A.2d 502, 506-507 (Pa. Super. 2006). An abuse of discretion is defined as manifest unreasonableness, partiality, prejudice or ill-will and not merely a circumstance in which the record would or could support a different result. *Id.* at 1049. Moreover, the appellate court has emphasized the deference afforded to trial courts because of their first-hand observations of the parties spanning multiple hearings. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Recently, our Pennsylvania Supreme Court has further expounded on this standard, stating:

> Because trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this area, appellate courts defer to the trial courts' first-hand observations as

8

they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error or law, and appellate courts may reverse trial courts only when that discretion has been breached or when the law has been misapplied. In other words, the court should review the certified record to decide whether it supports the trial court's order, regardless of whether the appellate court agrees with the result that the trial court reached.

*In the Interest of S.K.L.R.*, 256 A. 3d at 1129 (2021). To affirm, the appellate court must only agree that grounds exist for termination under any of subsection of the applicable law. See *C.J.P.* at 114 A.3d at 1050. Grounds for termination include, *inter alia*, the following subsections:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. [...]

> (5) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. [...]

> (8) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

9

23 Pa.C.S. §2511 (a)(2), (a)(5), and (a)(8). The burden is upon the petitioner to prove the asserted grounds for seeking termination of parental rights by clear and convincing evidence. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). In a termination of parental rights proceeding, the best interests of the child is not the initial or only consideration, as the court must first find that the statutory grounds for termination of parental rights have been met. *Kimock v. Jones*, 47 A.3d 850 (Pa. Super. 2012). When grounds have been shown by clear and convincing evidence, the court must then consider whether the termination would meet the needs and welfare pursuant to §2511(b), which states:

> (b) Other considerations. – The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the Court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa.C.S. §2511(b). This §2511(b) analysis requires focus on the child, as well as the individual and unique circumstances of that child's case. *In re K.T.*, 296 A3d 1085, 1105 (Pa. 2023). The court's inquiry requires examination of intangibles that are key components of a child's needs and welfare, such as love, comfort, security, and stability, as well as the bond the child has with the foster parents or parent. *Id.* at 1106; see also *Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.

10

Super 2017). Consideration of any possible parental bonds are only but one factor among many. See *K.T.*; see also *In re N.A.M.*, 33 A. 3d 95, 103 (Pa. Super. 2011). As the trial court possesses the discretion to weigh the factors of each individual case, the trial court also considers whether termination of the parent's rights would destroy an existing, necessary, and beneficial relationship. *Id.*

## Discussion

Mother appeals the orders terminating her parental rights and in her concise statement, alleges:

> The trial court abused its discretion and/or erred as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(2) (5) and (8). There was not clear and convincing evidence that the repeated and continued incapacity, abuse, neglect, or refusal of Mother caused the child to be without essential parental care, control, or subsistence necessary for their physical or mental well-being, and that the conditions and causes of any incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother. The conditions which led to the removal of the child either no longer exist or can be remedied within a reasonable period of time and termination of parental rights does not serve the needs and welfare of the child.

> The trial court abused its discretion and/or erred as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b), when the record does not support such a finding. Furthermore, CYF failed to meet its burden under 23 Pa.C.S. §2511(a) which should have precluded the trial court from making a finding under §2511(b).

11

*See* Mother's Concise Statement of Errors Complained of on Appeal filed on October 22, 2024 for N.B and D.R.D. at AP-02-49-2024 and AP-02-50-2024. Mother raises issues on appeal without any specificity or identification as to where in the record there was an error and/or abuse of discretion. The Concise Statement largely mirrors the statutory language, which violates the Pennsylvania Rules of Appellate Procedure 1925(b)(4)(ii) (Requirements; waiver). Appellant is required to concisely identify each error with sufficient detail so as to identify the issue to be raised before the judge. *Id.* Compliance with this rule allows the court to issue an opinion tailored to the specific issue(s) raised on appeal, rather than undertake a review of the entire record in an attempt to determine the issue(s) on appeal. Therefore, this court believes that due to the lack of overall specificity in the Concise Statement, Mother's issues should be deemed issues raised for the first time; for this reason, the Mother's arguments should be waived. See Pennsylvania Rules of Appellate Procedure 1925(b)(4)(vii). Notwithstanding, the court will provide the analysis as to these issues below.

## §2511 (a)(2)

With respect to 23 Pa. C.S. § 2511(a)(2), CYF clearly and convincingly proved that the repeated and continued incapacity, abuse, neglect, or refusal of Mother caused these Children to be without essential parental care control, or subsistence necessary for their physical or mental well-being, and the conditions and causes of Mother's incapacity, abuse neglect, or refusal would not be remedied

12

by Mother. The record is replete with evidence that the concerns that existed at the time of the removal continued to exist, with very limited change, at the time of the termination proceeding.

These Children came into care shortly after Mother gave birth to the younger Child on January 30, 2023, wherein both she and the newborn tested positive for multiple substances. T.T. at 50. Mother's older Child, was two years and three months old at the time of the removal. Mother testified that she used when he was in another room. Mother admitted to one prenatal appointment, macrodosing her methadone because she was getting sick, and using heroin while pregnant. CYF Exhibit 2 - Combined Court Orders. Initially, the Children were placed into two separate placements. The oldest was placed into a non-relative Three Rivers Adoption Council ("TRAC") foster home and the newborn was placed into the home of an alleged paternal grandmother, later determined by paternity testing to be a non-relative. *Id.* The younger Child joined his older sibling in the TRAC foster home in May 2023. T.T. at 50-51. Both Children were ultimately placed with maternal grandmother on May 31, 2024 after she relocated from Florida to serve as a stable, permanent family placement for the Children. The Children have been in the home of their grandmother since that time. *Id.* at 62; *see also* CYF Exhibit 2 - Combined Court Orders; *see also* CYF Exhibit 1 - Dr. O'Hara Evaluation Report 9/9/24.

13

At the adjudication hearing, Mother was ordered to address several things, including: complete a drug and alcohol evaluation through POWER and comply with their recommendations, complete random urine screens, attend supervised visits with the Children, attend the Children's medical appointments, and address any of her own mental health needs. *Id.* at 51; see also CYF Exhibit 2 - Combined Court Orders. CYF completed four separate Family Service Plans on March 3, 2023, August 16, 2023, February 20, 2024, and September 17, 2024. These service plans meetings aimed to create a roadmap for Mother to address goals and work towards reunification. *Id.* at 53; see also CYF Exhibit 3 - Combined Family Service Plans. Mother attended only two of the four Family Service Plan Meetings. *Id.* In each of these plans, Mother's goals to remain in contact with CYF, work with in-home services, continue her supervised visits, comply with her recommended medical assisted treatment[6], attend random urine screens, obtain housing, and maintain her mental health medication management, and attend treatment for her substance abuse issues at the appropriate level of care. *Id.*

Mother failed to remain in regular contact with CYF from adjudication through February 2024. *Id.* at 54.

---

[6] At certain times during the pendency of the case, Mother participated in medically assisted treatment for her opiate addiction, sometimes referred to in records, plans or court orders as "MAP."

14

CYF made multiple referrals for drug and alcohol assessments through POWER over the pendency of this case. *Id.* at 55. CYF made referrals on February 1, 2023, May 3, 2023, October 23, 2023, and August 23, 2023. *Id.* At the termination proceeding, the POWER representative testified to extensive efforts made to engage Mother. *Id.* at 5-13.

Mother was ordered to participate in random urines at the Allegheny County Health Department. *Id.* at 55. CYF called Mother in for fifty-six (56) screens and Mother only appeared for seven (7) screens. *Id.* at 56. CYF provided both bus passes and gas assistance, during times when Mother identified having vehicle transportation, to attend these screens. *Id.* Likewise, a representative from the Allegheny County Health Department testified to Mother's screens and results. *Id.* at 14-19.

CYF testified that they never received any documentation from Mother that she engaged in drug and alcohol treatment, either in the form of a five-point letter or certificate of program completion. *Id.* At different times during the dependency case, Mother participated in the permanency review hearings by phone because she said she was inpatient treatment; however, CYF was never able to verify successful completion of any treatment. *Id.* at 55.

CYF believed that Mother's mental health medication was provided by her primary care physician but was never able to verify this information. *Id.* at 55-56.

15

Moreover, however, CYF did not receive any documentation or releases of information for treatment related to her mental health. *Id.*

Mother inconsistently worked with the weekly in-home services provided by CYF, and in-home services closed unsuccessfully in June 2024. *Id.* at 57. Mother's did not establish stable housing. *Id.* at 57; see also CYF Exhibit 2 - Combined Court Orders.

Mother's visitation with the children was inconsistent, and testimony from the Three Rivers Adoption Council ("TRAC") foster care agency that the Children resided in prior to being placed into the home of the maternal grandmother, Denise Kushik demonstrated the same. *Id.* at 51; 72-85. Mother's visits were supervised throughout the dependency case except for a brief window of time, from April 4, 2024 to approximately May 8, 2024, where the court permitted unsupervised contact between Mother and the Children, until such time as when Mother disclosed a relapse and the court ordered the visits return to supervised. *Id.* at 61. At the time of the termination hearing, Mother's visits were still being supervised by maternal grandmother. *Id.* at 62.

Mother had pending criminal matters during the dependency case, and at the time of the termination hearing, Mother still had pending charges from September 2024 for a retail theft charge. *Id.* at 59; see also CYF Exhibit 4 - Certified Criminal Records.

16

Mother participated in the termination hearing by telephone. *Id.* at 3. Mother testified that she had been inpatient for drug and alcohol treatment three times during the dependency case, stating that she attended Gateway Aliquippa two times, and Gateway Mt. Pleasant once. *Id.* at 92. Mother testified that she believed her therapist had sent in completion letters to CYF for the first two inpatient stays, and she testified ate the last time she was in inpatient, from January 26 to February 29, 2024, that she completed that stay and a completion letter was sent to the agency. *Id.* at 92. Mother did not follow up to ensure documentation of these inpatient stays were actually received by CYF and stated, "I mean, to my knowledge, I was told that they were all e-mailed, that they knew what was going on. I do know, to my knowledge, that in other hearings they've done the same thing, they didn't know that I had completed, and then it was corrected. So I'm not really sure on why they're saying they didn't know that I had completed my program, because they do know that. It's like no one is keeping the right answers written down, and they are all scrambling on different cases." *Id.* at 92-93. Mother testified that she did multiple inpatient stays because she was having issues and did not "feel secure being home yet" but felt much better after her third inpatient stay at Gateway Mt. Pleasant. *Id.* at 94.

Mother testified about making a self-referral to POWER the week before the contested termination hearing, and testified by reading a letter from POWER,

17

which stated: "[Mother] participated in a walk-in POWER LOC[7] assessment Tuesday, 10/1. A urine screen was completed and it did not indicate substance use. [Mother] accepted the recommendation for LOC. The recommendation is for 1.0 outpatient. [Mother[ accepted her referral of POWER New Day, and is scheduled to start on 10/10/2024 at 3:00 p.m."[8] *Id.* at 94. Mother testified that she did this self-referral to POWER because she needed to be in some kind of treatment to be considered for the ARIA housing program.[9] *Id.* at 95. Mother continued her testimony and claiming prior agency caseworker claimed she had to attend groups, which she did not want to do, and alleged "roadblocks" had been put up for her. *Id.* at 96.

When further questioned by her attorney about attending any other outpatient drug and alcohol services, Mother testified, "I tried to do — I went — I attempted to go to group, yes." *Id.* at 97. When asked her current clean date, Mother stated "My current clean date is 1/27/23 — 24. I'm sorry." *Id.* When asked how this could be her clean date when a urine container device was found on her when she went to a screen on May 6, 2024, Mother explained that she "did smoke marijuana. Marijuana is not one of my problems. I also am in the middle

---

[7] LOC stands for "level of care."

[8] POWER New Day, an outpatient substance abuse treatment program, is part of the continuum of services they can offer individuals based on their needs.

[9] The ARIA housing program helps provide subsidized housing to individuals actively engaged in treatment for substance abuse.

of working on a marijuana card. So I didn't know what to do, because you guys hold things agains people, and there's no explanation or any of it. Now., my sobriety from hardcore drugs, that's my sobriety." *Id.* at 102-103. Mother clarified that her sobriety date from drugs other than marijuana was January 26, 2024. *Id.* at 104.

Mother testified that she maintains her current sobriety by keeping busy, looking for a job, working on cars, and visiting with her children at her mother's home. *Id.* at 97-98. Mother stated that she has a doctor but it is just her primary care physician and testified that "therapy is something that would be very, very helpful to me. It's what I've been wanting. But I just keep myself busy and thinking about my kids." *Id.* at 98. Mother did not provide any explanation as to her inability to access mental health therapy during the twenty months the Children had been in care.

With respect to her other goals, Mother stated her first in-home service worker was "amazing" but she left and was assigned a new in-home worker that "And, I mean, I'm sorry. I'm a certain type of person, and I have to feel comfortable with a person who I am put in front of, who's supposed to be helping me and things. And if I don't feel comfortable with them, I don't understand how you guys want me to productively work with them." *Id.* at 99. Mother testified that she stopped working with in-home services after the worker she liked left. *Id.*

19

With respect to housing, Mother testified that she was scheduled to meet with someone from the ARIA program later that same week, as the termination hearing, to look at addresses of homes she located. *Id.*

Mother testified that she visits her Children three or four times a week at her Mother's home, and that she FaceTimes with them when they get home from school. *Id.* Maternal grandmother is the court appointed medical and educational for the children; however, Mother said that she accompanies the Children on their medical appointments and talks to the therapist. *Id.* at 101; see CYF Exhibit 2 - Combine Court Orders.

Mother testified that the entire time she had been working with CYF they have "been putting nothing but roadblocks up for me" and alleged that her life had been "disrupted" and "literally went down the tubes" since CYF's involvement. *Id.* at 102.

Mother did not present any credible evidence or testimony to contradict the evidence and testimony in support of this court's conclusion. This court appropriately found that CYF presented clear and convincing evidence with respect to 23 Pa. C.S. § 2511(a)(2). Mother had not made substantial, meaningful progress on her family service plan goals, which was critical to reunification. At the time of the termination hearing on October 9, 2024, Mother had just recently completed a self-referral to POWER in order, indicated she did so in order to

obtain housing through the ARIA program, but had not yet started treatment or established housing stability. Mother failed to appreciate how her actions (or lack of action) impacted reunification efforts and instead assigned the failure of her progress to outside forces, such as CYF. At the time of the termination, the Children had been in care for twenty-months. The younger Child, removed shortly after birth having been born with substances in his system, never lived in her care. These Children could not wait indefinitely for Mother to gain the ability or willingness to address her court ordered goals, and the evidence was overwhelming that Mother either could not or would not remedy the conditions that led these Children to be removed from her care on February 2, 2023. As such, this court did not commit an error of law or abuse of discretion when entering an order terminating Mother's parental rights under § 2511(a)(2).

### §2511(a)(5) and (8)

Upon consideration of all of the testimony and evidence, this court found that CYF presented clear and convincing evidence that Mother could not or would not remedy the conditions which led to the removal and placement of her Children within a reasonable period of time, and that the services or assistance reasonably available to Mother were not likely to remedy the conditions which led to the removal or placement of these Children in a reasonable period of time, and that termination of Mother's rights best served the needs and welfare of the Children.

21

The record reflects that the Children were removed from Mother's care on or about February 2, 2023 when CYF obtained an emergency custody order and spent the last twenty months in placement. CYF Exhibit 2 - Combined Court Orders. Therefore, this court correctly found that the Children had been out of Mother's care for six and twelve months, respectively, as required by each subsection of the statute.

While largely addressed in the discussion section of §2511(a)(2) above, which outlined the evidence and testimony in support of Mother's inability or unwillingness to remedy the conditions that brought these Children into care, it was evident by Mother's own testimony in the hearing that she had just recently started to address specific goals related to substance abuse. She hadn't even begun the recommended level of treatment received from her POWER self-referral days before the termination hearing. Mother still had not obtained housing stability. She agreed that she failed to work with in-home services because she didn't like the second worker that was assigned. Mother testified that she thought therapy would be a good idea for her but had no evidence of participating in any mental health treatment.

In addition to looking at the testimony and evidence submitted by CYF, the court considered the credible testimony and analysis provided by the court appointed evaluator, Dr. Terry O'Hara, who conducted several evaluations in this case between April to September 2024. T.T. at 22; see CYF Exhibit 1 - Dr. O'Hara

22

Evaluation Report 9/9/24. Dr. O'Hara testified that his most recent individual of Mother was on September 9, 2024, at which time he also conducted an interactional of Mother and the Children, and an interactional of maternal grandmother and the Children. *Id.*

Dr. O'Hara testified that he diagnosed Mother with generalized anxiety disorder, unspecified depressive disorder, ADHD combined, presentation by history, with a rule out of panic disorder, stimulant disorder, mild cocaine and sustained remission, opioid disorder - mild and sustained remission. *Id.* at 23. Dr. O'Hara testified that with respect to the cocaine and opioid use disorder were based on Mother's account. *Id.*

Dr. O'Hara had several concerns regarding Mother's presentation, including "externalized responsibility for her circumstances" wherein Mother was not taking much responsibility for CYF's involvement and the placement of her children in this case. *Id.* at 24. Mother did acknowledge a history of using crack cocaine and heroin and that Mother's account, she did not complete IOP and denied being involved in services at that evaluation. *Id.* Dr. O'Hara also noted that Mother reported some significant medical issues which included "lupus, fibromyalgia, rheumatoid arthritis" but Mother did not indicate that these conditions impacted her ability to parent. *Id.* at 25.

Dr. O'Hara observed that Mother displayed positive parenting skills in her interactional with her children, where she praised, redirected, and encouraged age

23

appropriate skills and toys. *Id.* at 26. However, during the interactional assessment, Mother reported that she had some difficulties managing the younger Child. *Id.* Dr. O'Hara observed that there were times when Mother appeared to interact with the younger Child to the exclusion of the older Child. *Id.* Dr. O'Hara reported that the younger Child was upset with maternal grandmother took the older Child to the bathroom during the evaluation, and Mother commented on how "attached" the younger Child was with his maternal grandmother. *Id.*

At the time of Mother's individual evaluation with Dr. O'Hara on September 9, 2024, Mother was residing with her long-term boyfriend, who was not the father of either Child, in the home of his mother and his mother's paramour. CYF Exhibit 1 - Dr. O'Hara's Evaluation Report 9/9/24. Mother reported that this living environment was "very chaotic." *Id.* When inquired as to whether she was in a position to care for the children's needs and welfare at this time, she replied, "I need my own home. I could at my Mom's house, there was a referral one year ago through Family Links, I'm finally getting an interview and looking right now, I'm way closer (to housing) than last time." *Id.* Mother admitted she was not employed. *Id.* Dr. O'Hara's evaluation stated:

> Nevertheless, the children have apparently been in placement for 19 months and permanency is of urgent importance for them, especially considering some of the developmental needs for both children. In February, the Court determined minimal progress by [Mother] and that [Mother] and [her boyfriend] were not submitting screens. In this examiner's evaluation involving [Mother], she exhibited some parenting deficits and reported a history of significant mental health

24

issues, substance abuse concerns, and IPV [intimate partner violence] in two relationships. This examiner does not possess evidence that these concerns have been sufficiently addressed in treatment with [Mother].... As a result of these factors, this examiner does not have evidence that [Mother] is in a position to appropriately care for the children's needs and welfare. This examiner has some concerns about unsupervised contact for the children with [Mother], without evidence that she has meaningfully addressed mental health, substance abuse, and IPV concerns. There are some negative indicators for prognosis, as [Mother] does not appear motivated to participate with intensive dual-diagnosis services, which would be advisable for her.

CYF Exhibit 1 - Dr. O'Hara Evaluation Report 9/9/24. The testimony and report from Dr. O'Hara contributed to the compelling and credible evidence that supported termination pursuant §2511(a)(5) and (8).

CYF had provided a number of referrals and services that would reasonably allow Mother to address the conditions that led to removal and Mother did not avail herself of such assistance. Mother made a self-referral to POWER for an assessment a week before the termination hearing, had not started treatment, and testified she did this so she could qualify for housing assistance through the ARIA program. Mother was unable to present or provide any documentation, reliable testimony, or evidence that would credibly support that Mother could address these her goals with these services in a reasonable time. The court appointed evaluator reached a similar conclusion and found that these Children were in need of permanency and Mother could not appropriately care for their needs and welfare. In comparison, the maternal grandmother demonstrated "stability, strong parenting skills" during her interactional evaluation with the Children. Thus, this court

25

soundly reached the conclusion that termination and adoption with their grandmother would best serve the needs and welfare of these young Children.

The second part of the §2511(a)(5) and (8) analysis requires the court to consider it termination would best serve the needs and welfare of the child. This court will elaborate further on the best interest analysis, which is a component of these two subsections, within the §2511(b) section below.

## §2511(b)

Having found that CYF met their statutory burden pursuant to the statutory requirements pursuant to §2511(a), the court then turned to the best interest analysis required under §2511(b). A thorough review of the record in this case demonstrates that termination of Mother's parental rights clearly and convincingly meets the needs and welfare of the Children and that termination was overall in the Children's best interest. The court does not dispute that Mother loves her Children and has a desire to parent her Children. Nevertheless, once grounds have been established pursuant to §2511(a), the court must give "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa. C.S. §2511(b).

Dr. O'Hara indicated his report that "potential detriment should be weighted against [Mother's] stability, the length of time the children have been in care, the children's need for permanency, and the children's meaningful relationship with

their maternal grandmother." CYF Exhibit 1 - Dr. O'Hara Evaluation Report 9/9/24.

Evidence and testimony regarding Mother's parenting skills and capacity were addressed and assessed by Dr. O'Hara, and CYF provided ample testimony that Mother failed to consistently avail herself of visitation such that she was able to move to unsupervised visits to overnights to reunification. After gaining court ordered permission to have unsupervised with her Children, Mother relapsed within weeks and attended a urine screen at the Allegheny County Health Department with a urine screen device strapped to her leg to avoid a positive result. Moreover, Mother's testimony demonstrated her lack of understanding her role in how these conditions and issues, which led to removal, continued to exist. Instead of taking responsibility or ownership, Mother testified that CYF either put up roadblocks or were being dishonest, and made decisions about participating in services based on whether she liked the assigned in-home service worker. Mother continually blamed others for her lack of successful progress or perceived hurdles that impeded her progress. Dr. O'Hara aptly concluded that Mother was not in the position, at an evaluation a month prior to the termination proceeding, to appropriately look after the Children's needs and welfare.

This Court is charged with examining intangibles such as love, comfort, security, and stability, identified as a key component of a child's needs and welfare. In re K.T., 296 A.3d 1085, 1105 (Pa. 2023). Where a bond exists between the

27

parent and child, this court must also examine whether termination would destroy a "necessary and beneficial relationship" that could possibly cause a child to suffer extreme emotional circumstances. *Id.* This court finds that while Mother may have an emotional bond with these Children, this is only one of the many factors that the court is charged with considering when determining what is in the best interests of each Child.

Dr. O'Hara testified that during the interactional evaluation with maternal grandmother he observed her to possess several positive parenting skills and a positive bond with the Children. T.T. at 28, 30. Dr. O'Hara, through his collateral contacts, testified that the foster care agency working with maternal grandmother did not have any concerns about her care of the Children. *Id.* at 31. Dr. O'Hara's testimony was that any potential detriment that termination could have on these Children would be mitigated by the fact that the Children were with the maternal grandmother, stating "I think that would be a potential mitigating factor, yes. [Maternal grandmother] appears very open to contact between the children with her daughter, especially if her daughter is doing well and remaining clean and adhering to what's recommended of her. I would consider the children's relationship with their maternal grandmother, the stability with [maternal grandmother]. I would say facts should also be weighed, including the amount of time that the children have been out of parental care, [Mother's] lack of demonstration of sufficiently addressing the issues that necessitated placement. So

28

I think yes, all of those factors should be considered." *Id.* at 33. Dr. O'Hara testified that permanency for Children that had been in care this long was critically important, stating, "It sets the foundation for a normal development trajectory. Children do much better when they're in situations of safety, stability, and security." *Id.* at 44.

The CYF permanency supervisor, Timothy Jashinski, testified about his observations of the Children in the home of the maternal grandmother. "The children are very attached to her. They look for her to meet their needs. I mean, a stranger coming to their house, they were a little apprehensive of me being there, so they would go to her for support. But she seems to be providing for all of their needs. There were no concerns regarding their safety. They looked to her for reassurance, and she does a nice job with them." *Id.* at 87. Mr. Jashinski reported that the children were receiving developmental services, had age appropriate toys and activities in the home, and were up to date medically. *Id.*

This court agreed with the evidence and testimony presented by CYF, as well as by Dr. O'Hara, and found that any potential detriment to the Children from terminating Mother's rights would be mitigated by the loving and secure relationship the Children and maternal grandmother had established. Additionally, this court found that the time in care necessitated permanency critical to their best interests, and that termination would best meet the developmental, physical and emotional needs and welfare of the Children. For the foregoing reasons, this court

29

did not commit an error of law or abuse of discretion in finding that termination best met the needs and welfare pursuant to §2511(b).

## Conclusion

Based on the opinion set forth, this court's orders granting the involuntary termination of parental rights to Mother should be affirmed.

BY THE COURT:

_Jennifer Onley McCready_

_____, J.